UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| CITY OF COLUMBUS, OHIO, | ) | |
| | ) | MDL No. 2873 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Master Docket No. 2:18-mn-2873 |
| | ) | |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); | ) | Judge Richard Mark Gergel |
| AGC CHEMICALS AMERICAS, INC.; | ) | Civil Action No. 2:23-cv-04387-RMG |
| ARCHROMA U.S., INC.; | ) | |
| ARKEMA, INC.; | ) | |
| BASF CORPORATION; | ) | COMPLAINT AND DEMAND FOR |
| BUCKEYE FIRE EQUIPMENT COMPANY; | ) | JURY TRIAL |
| CARRIER FIRE & SECURITY AMERICAS CORPORATION (f/k/a UTC FIRE & SECURITY AMERICAS CORPORATION); | ) | |
| CARRIER GLOBAL CORPORATION; | ) | |
| CHEMGUARD, INC.; | ) | |
| CLARIANT CORPORATION; | ) | |
| CORTEVA, INC.; | ) | |
| DUPONT DE NEMOURS, INC.; | ) | |
| DYNAX CORPORATION; | ) | |
| EIDP, INC. (f/k/a E.I. DU PONT DE NEMOURS AND COMPANY); | ) | |
| JOHN DOE DEFENDANTS 1-49; | ) | |
| KIDDE PLC, INC.; | ) | |
| NATIONAL FOAM, INC.; | ) | |
| THE CHEMOURS COMPANY; | ) | |
| TYCO FIRE PRODUCTS LP, as successor-in-interest to The Ansul Company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

**SUMMARY OF THE CASE**

1.     Plaintiff, City of Columbus, Ohio ("Plaintiff"), is an Ohio municipality that owns property and operates a water system that provides drinking water to residents and businesses in Ohio. Plaintiff brings this action to recover the substantial costs necessary to address the contamination of its property and protect its drinking water supply from the impacts of synthetic per- and polyfluoroalkyl substances ("PFAS").

2.     Plaintiff brings this action to recover costs associated with the contamination of its property and drinking water supply with PFAS and further seeks abatement of the ongoing nuisance these chemicals constitute in the environment, and for all such other action as is necessary to ensure that the PFAS that contaminate Plaintiff's property and drinking water supply do not present a risk to the public. In this Complaint, the term PFAS, includes without limitation, perfluorooctanesulfonic acid ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluorobutanesulfonic acid ("PFBS"), and perfluorohexanesulfonic acid (PFHxS), GenX, as well as all of their salts and ionic states, and the acid forms of the molecules and their chemical precursors.

3.     PFAS are persistent, toxic, and bioaccumulative compounds when released into the environment. PFAS have impacted soils, stormwater, surface water and groundwater, and now contaminate Plaintiff's property and the water relied on by Plaintiff as sources of drinking water.

4.     Defendants are companies that designed, manufactured, marketed, distributed, and/or sold PFAS, the chemical precursors of PFAS, and/or products containing PFAS, and/or their chemical precursors. Defendants made products with PFAS including but not limited to, Teflon®, Scotchgard®, waterproofing compounds, stain-proofing compounds, waxes, cloth coatings, paper and food package coatings like Zonyl®, aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires, and fluorosurfactants used in

the manufacture of AFFF as well as telomer building blocks used to make fluorosurfactants that were then used to manufacture other PFAS-containing products, including AFFF. Collectively, Defendants' PFOA, PFOS, precursors, products containing PFAS, AFFF, and other products and intermediates containing PFAS are referred to herein as "Fluorochemical Products."

5.     Defendants designed, advertised, manufactured, marketed, distributed, stored and/or sold Fluorochemical Products with the knowledge that these toxic compounds would be released into the environment during fire protection, fire training, and response activities, even when used as directed and intended by Defendants, or would be directly released into the environment from Defendants' manufacturing facilities as a result of their manufacture and/or use by Defendants at such facilities.

6.     Defendants were also aware that their Fluorochemical Products would be and have been used, released, stored, and/or disposed of at, near, or within the vicinity of Plaintiff's property and drinking water supply such that PFAS, and their chemical precursors would enter the environment, migrate through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating Plaintiff's property and drinking water supply.

7.     As a result of the manufacture and/or use of Defendants' Fluorochemical Products for their intended purpose, PFAS and/or their chemical precursors have been detected in Plaintiff's drinking water supply and property.

8.     Defendants knew or reasonably should have known that their PFAS compounds would reach the soil and groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten public health and welfare.

9.     Plaintiff files this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate

3

Plaintiff for the costs of investigating, designing, constructing, installing, operating, and maintaining treatment facilities and equipment required to remove PFAS from its drinking water supplies and property; and for such other damages and relief the Court may order.

## PARTIES

10.     Plaintiff is an Ohio municipality in Franklin County, Ohio, having its principal place of business at 90 West Broad Street, Columbus, Ohio, 43215.  Plaintiff owns real property within Ohio, including but not limited to, fire stations, wastewater facilities, waste disposal facilities, and other locations where PFAS was used, released, or otherwise came to be located; operates a public water system serving approximately 1.4 million customers with residential and commercial connections; and is also a wholesaler provider of water within Ohio to the Cities of Bexley, Gahanna, Reynoldsburg and Obetz, the Earnhart Hill Regional Water & Sewer District, and the Franklin County Department of Sanitary Engineering.  Last year, Plaintiff delivered over 53 billion gallons of drinking water to the Greater Columbus Ohio Area, which equates to an average 145 million gallons a day.  Plaintiff obtains its water for public drinking water purposes from several sources, including the Scioto River, Big Walnut Creek, the Griggs, Hoover, and O'Shaughnessy Reservoirs, and from multiple groundwater wells drawing water from the underground aquifer in southern Franklin County, and operates three public water treatment plants, including the Dublin Road Water Plant on the Scioto River, Hap Cremean Water Plant on Big Walnut Creek, and Parsons Avenue Water Plant, which treats water from well fields.

11.     Upon information and belief, Defendants' Fluorochemical Products including, but not limited to, PFAS-containing fluorochemicals/intermediates and AFFF were used at properties owned and/or operated by Plaintiff and/or others and/or otherwise used and/or released into the environment in such a way that those compounds traveled by air, through soil, or through

stormwater, wastewater, surface water, groundwater, and/or other environmental media or pathways to contaminate Plaintiff's property and drinking water supply. Defendants' Fluorochemical Products have also been used and disposed of into wastewater systems and the environment in general, causing contamination to stormwater, surface water, and groundwater that traveled to Plaintiff's drinking water supply.

12.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133 and is registered to do business in Ohio.

> a.     Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold Fluorochemical Products. 3M manufactured, distributed, and sold AFFF containing PFOS throughout the United States, including in Ohio, and which has contaminated Plaintiff's property and drinking water supply. 3M was the only company that manufactured or sold AFFF containing PFOS.

> b.     3M researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold products and raw materials containing PFAS in markets around the country, including within Ohio, since at least the 1970s, and which has contaminated Plaintiff's property and drinking water supply. These product and raw material sales were based on intentional direction at the Ohio market for these products and raw materials and availment of Ohio laws.

13.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at 1400 Pennbrook Parkway, Lansdale, PA 19446. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International

plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. (Ansul and Tyco, as the successor in interest to Ansul, will hereinafter be collectively referred to as "Tyco/Ansul.")  Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorochemical surfactants containing PFOA throughout the United States, including in Ohio. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute, and sell AFFF that contained fluorocarbon surfactants containing PFOA throughout the United States, including in Ohio. Tyco/Ansul does business throughout the United States and is registered to do business in Ohio. Upon information and belief, Tyco/Ansul manufactured, distributed, and/or sold AFFF foam containing PFOA in Ohio and which has contaminated Plaintiff's property and drinking water supply.

14.     Defendant AGC Chemicals Americas Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC and/or its affiliates manufactured fluorochemicals used in AFFF, which materials were used in Ohio and which have contaminated Plaintiff's property and drinking water supply. AGC does and/or has done business throughout the United States and is registered to do business in Ohio. On information and belief, AGC is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass, Co., Ltd.) and does business throughout the United States.

15.     Defendant BASF Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation). On information and belief, Ciba Inc.

manufactured, marketed, promoted, distributed, and/or sold fluorochemicals and fluorosurfactants that contained PFAS used to manufacture AFFF, and those fluorochemicals, fluorosurfactants, and AFFF were transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Ohio, and have contaminated Plaintiff's property and drinking water supply. BASF does business throughout the United States.

16.     Defendant Carrier Fire & Security Americas Corporation (f/k/a UTC Fire & Security Americas Corporation) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.,[1] which is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire"). Carrier Fire is also the successor in interest to UTC Fire & Security Americas Corporation, Inc., following the spinoff transaction described immediately below. Carrier Fire, through Kidde/Kidde Fire, has manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS that was transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Ohio, and which has contaminated Plaintiff's property and drinking water supply. Carrier Fire has done business throughout the United States.

17.     Defendant Carrier Global Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. On or around April 3, 2020, United Technologies Corporation completed the spinoff of one of its reportable segments into Carrier,

---

[1] On May 14, 2023, Kidde-Fenwal, Inc. filed for bankruptcy in the case captioned *In re Kidde-Fenwal, Inc.*, Case No. 23-10638-LSS (D. Del. Bankr.). In light of the automatic stay of claims against Kidde-Fenwal, Inc. pursuant to 11 USC § 362, Kidde-Fenwal, Inc. is not named as a defendant herein.

a separate publicly traded company. Pursuant to the Separation and Distribution Agreement by and Among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier assumed certain liabilities, including those related to the business operated by Kidde/Kidde Fire. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Carrier's Fire & Security products and services are sold under brand names that include Chubb and Kidde. At all relevant times, Carrier conducted business throughout the United States, including in Ohio. Carrier, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in Ohio, and which contaminated Plaintiff's property and drinking water supply.

18.     Defendant Clariant Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 500 East Morehead Street, Suite 400, Charlotte, North Carolina 28202. Clariant has manufactured, marketed, promoted, distributed, and/or sold fluorochemicals that contained PFAS used to manufacture AFFF, and those fluorochemicals and AFFF were transported, stored, used, handled, trained with, used to test equipment, released, spilled, otherwise discharged, and/or disposed in Ohio, and have contaminated Plaintiff's property and drinking water supply. Clariant is a predecessor to Archroma and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Clariant is registered to do business in Ohio.

19.     Defendant Kidde PLC, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at Nine Farm Springs Road, Farmington, Connecticut 06032. Kidde PLC was part of United Technologies Corporation. At all relevant times, Kidde PLC conducted business throughout the United States, including in Ohio. Kidde PLC, through Kidde/Kidde Fire, manufactured, marketed, promoted, distributed,

and/or sold AFFF that contained PFAS throughout the United States, including in Ohio, and which has contaminated Plaintiff's property and drinking water supply.

20.     Defendant Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544. Dynax manufactured fluorosurfactants used in AFFF, which materials were used in Ohio and which have contaminated Plaintiff's property and drinking water supply, and does and/or has done business throughout the United States.

21.     Defendant Chemguard, Inc. is a Texas corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA. Upon information and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing PFOA throughout the United States including in Ohio. Upon information and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing PFOA in Ohio and which has contaminated Plaintiff's property and drinking water supply.

22.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Beginning in or around 2004, Buckeye manufactured, distributed, and/or sold AFFF containing PFOA. Buckeye does business throughout the United States, including in Ohio. Upon information and belief, Buckeye manufactured, distributed, and/or sold AFFF foam containing PFOA in Ohio and which has contaminated Plaintiff's property and drinking water supply.

23.     Defendant National Foam, Inc. (a/k/a Chubb National Foam) is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). At all relevant times, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds. Upon information and belief, National Foam manufactured, distributed, and/or sold AFFF foam containing PFOA in Ohio which has contaminated Plaintiff's property and drinking water supply.

24.     Defendant Arkema, Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Arkema and/or its predecessors manufactured fluorosurfactants used in AFFF, which materials were used in Ohio and which have contaminated Plaintiff's property and drinking water supply. Arkema is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. and does and/or has done business throughout the United States, including in Ohio, and is registered to business in the State of Ohio.

25.     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorochemical Products for use in AFFF sold throughout the United States, including in Ohio, which materials were used in Ohio and which have contaminated Plaintiff's property and drinking water supply,. On information and belief, Archroma is a successor to Clariant Corporation, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc.

10

26.    Defendant EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has done business throughout the United States, including conducting business in Ohio, and is registered to do business in Ohio.

a.    Old DuPont has been involved in the production and sale of fluorochemical intermediaries for use in AFFF manufacturing since the 1950s, including in Ohio, and which has contaminated Plaintiff's property and drinking water supply. When 3M left the market, Old DuPont took on a larger role in the AFFF market.

b.    Old DuPont has also manufactured, distributed, and sold Fluorochemical Products and raw PFAS around the country pursuant to a nationwide marketing campaign, including in Ohio, and which has contaminated Plaintiff's property and drinking water supply.

c.    Also on information and belief, Old DuPont was engaged in joint ventures and other business arrangements with Ohio entities for the development of Fluorochemical Products.

27.    Defendant The Chemours Company ("Chemours") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours does business throughout the United States, including conducting business in Ohio, and is registered to do business in Ohio.

a.    Chemours was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont completed its spin-off of Chemours as a separate publicly traded entity.

11

    b.     Chemours has received and begun manufacturing certain product lines from Old DuPont, including some product lines involving manufacture, sale, and distribution of PFAS-containing intermediates and Fluorochemical Products.

    c.     In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in Ohio, around the country, and indeed the world, and including as to contamination of Plaintiff's property and drinking water supply, and Chemours has continued (even after the spin-off) to manufacture and release PFAS in such a way, so as to continue to contaminate Plaintiff's property and drinking water supply.

28.    Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont does business throughout the United States, including in Ohio.

    a.     New DuPont assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in Ohio, around the country, and indeed the world, including contamination of Plaintiff's property and drinking water supply.

29.    Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Center Road, Wilmington, Delaware 19805. Corteva does business throughout the United States, including conducting business in Ohio, and is registered to do business in Ohio.

    a.     Corteva assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in Ohio, around the country, and indeed the world, including contamination of Plaintiff's property and drinking water supply.

30.     Upon information and belief, Defendant John Does 1-49 were manufacturers, distributors, and/or sellers of Fluorochemical Products. Although the identities of the John Doe Defendants are currently unknown, Plaintiff expects that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those entities' actual names to the complaint as defendants.

31.     Any and all references to a defendant or defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named defendants.

## JURISDICTION AND VENUE

32.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

33.     Plaintiff is filing this complaint as permitted by Case Management Order No. 3 (CMO 3) issued by Judge Richard M. Gergel of this Court. Pursuant to CMO 3, Plaintiff designates the United States District Court for the Southern District of Ohio as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391. But for CMO 3, venue is proper in the United States District Court for the Southern District of Ohio in that the events or omissions giving rise to the claim occurred in that district. Plaintiff respectfully requests that at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the Southern District of Ohio.

34.     The United States District Court for the Southern District of Ohio has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants purposefully manufactured, designed, marketed, advertised, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products, including AFFF, to various locations in the United States and Ohio, such that each Defendant knew or should have known that said products would be delivered to areas in Ohio for active use including, but

not limited to, during the course of training and firefighting activities, including at property owned and/or operated by Plaintiff or within Plaintiff's drinking water supply.

35.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Defendants engaged in business in the State of Ohio.

36.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in Ohio, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, advertising and/or otherwise being responsible for PFAS, and/or products that contain PFAS, and that said activity by the Defendants is substantially connected to the Plaintiff's claims as alleged herein.

37.     Based on information and belief, the Defendants purposefully availed themselves with the forum of the State of Ohio giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of Ohio are believed to include, but are not limited to: 1) the Defendants' contractual relationships with the entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, advertising, selling, and/or otherwise being responsible for PFAS, and/or products that contain PFAS, and that said activity is substantially connected to the Plaintiff's claims as alleged herein; 2) agreements between the Defendants and entities, institutions and scientists/ academics within the State of Ohio regarding the PFAS, and/or products that contain PFAS where the Defendants contractually consented to have state courts within the State of Ohio adjudicate disputes; 3) conducted purposeful and direct promotion, marketing, advertising, selling, and advising third-party sellers of the PFAS, and/or products that contain PFAS, targeted specifically to consumers and businesses within the State of Ohio; 4) lobbying, consulting, and

advisory efforts on behalf of the Defendants with regard to the PFAS, and/or products that contain PFAS in the State of Ohio; and 5) and other actions by Defendants targeted to the State of Ohio to be obtained through discovery and other means. As the location from which the Defendants' suit-related conduct arose, Ohio has a substantial vested interest in the acts of the Defendants which led to the underlying controversy.

38.    At all times herein mentioned, the Defendants, each of them, had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants to Plaintiff.

39.    Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Southern District of Ohio does not offend traditional notions of fair play and substantial justice.

## BACKGROUND AND FACTUAL ALLEGATIONS
## THE PFAS COMPOUNDS

40.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

41.    PFAS have been used for decades in industrial settings and in the production of thousands of common household and commercial products, including those that are heat resistant, stain resistant, long lasting, and water and oil repellant.

42.    The PFAS family of chemicals are entirely anthropogenic and do not exist in nature.

43.    PFAS are known to have characteristics that cause extensive and persistent environmental contamination.

44.    Specifically, PFAS are persistent, toxic, and bioaccumulative, as well as highly mobile in soil and groundwater.

45.     PFAS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

46.     PFAS are readily transported through the air and in stormwater, as well as the soil and into groundwater where they can migrate long distances.

47.     PFAS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

48.     PFAS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

49.     Once PFAS are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, they migrate through the environment and into stormwater, surface water and groundwater.

50.     PFAS resist natural degradation and are difficult and costly to remove from soil and water.

51.     PFAS bioaccumulate, biopersist, and biomagnify in the food web, including in people and other organisms.

52.     Exposure to PFAS has been associated with several negative health outcomes in both humans and animals, including, but not limited to, the following:

a.     Altered growth, learning, and behavior of infants and older children;

b.     Lowering a woman's chance of getting pregnant;

c.     Interference with the body's natural hormones;

d.     Increased cholesterol levels;

e.     Modulation of the immune system;

f.     Increased risk of certain cancers; and

g.      Increased risk of ulcerative colitis;

53.     Contamination from PFAS presents a threat to public health and the environment.

54.     In addition to drinking contaminated water, humans can be exposed to PFAS through inhalation, ingestion of contaminated food, and dermal contact.

55.     PFAS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products.

56.     Releases of PFAS to land, air, and water from industrial sites are known pathways to the environment for PFAS.

57.     Due to their widespread use in consumer and commercial products, PFAS may also enter the environment from wastewater treatment facilities after the products containing them have been disposed of in landfills, during the use of the products, or in other manners.

58.     On information and belief, PFAS have been released into the environment from these various pathways of contamination to soils and surface and groundwater, including by the use of recycled wastewater and stormwater to recharge groundwater supplies, in and around Plaintiff's property and drinking water supply.

59.     In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, e.g., by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchgard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, paper and food package coatings like Zonyl®, and through use of PFAS-containing cook wear, including Teflon®.

60.     Also, on information and belief, the Defendants sold PFAS and/or PFAS-containing products to companies with Ohio locations that Defendants knew or should have known would be used and/or disposed of in Ohio.

61.     3M and Old DuPont branded products are sold throughout the United States and inside Ohio based on nationwide advertising and marketing campaigns.

62.     Old DuPont (and later Chemours) branded intermediate products, including (for example) automobile-coating products, are sold to and applied within Franklin County in Ohio, which coatings would have been applied at and pursuant to Old DuPont's (and later Chemours') instruction and, on information and belief, with training from Old DuPont (and later Chemours).

63.     Defendants have directed PFAS or PFAS-containing products and intermediates made with PFAS or materials that result in the release of PFAS into the environment, to Ohio consumers or businesses for consumption, use, and disposal in Ohio.

64.     All the while, the Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

65.     The Defendants' manufacture, distribution and/or sale of PFAS and/or products containing PFAS resulted in the release of PFAS into the environment in Ohio.

66.     Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Defendants knew, foresaw, and/or should have known and/or foreseen that PFAS would contaminate the environment.

67.     The Defendants knew, foresaw, and/or should have known and/or foreseen that their marketing, promotion, advertising, development, manufacture, distribution, release, training

of users of, production of instructional materials about, sale and/or use of PFAS containing materials, including in Ohio, would result in the contamination of Plaintiff's property and drinking water supply.

68. The Defendants' products were unreasonably and inherently dangerous and the Defendants failed to warn of this danger.

### THE PLAINTIFF'S PROPERTY AND WATER SUPPLY

69. On information and belief, Plaintiff's property and water supply has been contaminated by the use and discharge of Fluorochemical Products, including AFFF, such that Fluorochemical Products has traveled via surface water, stormwater, groundwater, and/or otherwise to contaminate Plaintiff's property and drinking water supply.

70. PFAS have impacted soils, surface water, stormwater, and groundwater, and now contaminate the water relied upon by Plaintiff as a source of drinking water.

71. In June 2022, the federal EPA issued new interim lifetime drinking water health advisories of 0.004 ppt for PFOA, 0.02 ppt for PFOS, and a guideline of 10 ppt for GenX in drinking water.

72. In March 2023, the federal EPA proposed an MCL of 4 ppt for PFOA and 4 ppt for PFOS and a new hazard index calculation for other PFAS, including GenX.

73. The State of Ohio's Environmental Protection Agency is currently following the federal EPA's drinking water guidelines for PFAS.

74. Defendants' PFAS have been detected in the source water for Plaintiff's drinking water supplies at levels above the federal (and corresponding state) health advisory levels.

### 3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS

75.     For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFOS in the United States.

76.     3M is the only known manufacturer of PFOS in the United States.

77.     3M began producing PFOS and PFOA as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

78.     3M produced PFOS by electrochemical fluorination beginning in the 1940s.

79.     Electrochemical fluorination results in a product that contains and/or breaks down into compounds containing PFOS and/or PFOA.

80.     3M went on to market and promote PFAS and shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including Ohio. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to Ohio and throughout the country for decades until announcing in 2000 that it would cease production of PFOA and PFOS (described in more detail below).

### OLD DUPONT'S USE AND MANUFACTURE OF PFOA

81.     Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the manufacturing process for Old DuPont's name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

82.     Old DuPont has also used PFAS in other name-brand products such as Stainmaster®, and manufactured a variety of PFAS-containing products, such as fluorochemical-based surfactants used in AFFF, including through a telomerization process that included, contained, degraded, or broke down into and/or generated PFOA.

83.     Although Old DuPont was fully aware that PFOA was an inherently dangerous and toxic chemical for decades, it produced its own PFAS compounds for use in its manufacturing processes, including its initiation of PFOA production as 3M phased out production of PFOA.

84.     Old DuPont marketed and promoted PFAS, and it shipped PFAS and PFAS-containing products to manufacturers throughout the United States, including Ohio. Old DuPont made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to Ohio as well as throughout the country for decades, including with PFOA, which Old DuPont publicly claimed to have stopped manufacturing in 2013.

## 3M'S KNOWLEDGE OF THE DANGERS OF PFAS

85.     In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

86.     3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

87.     By the early 1960s, 3M understood that some PFAS are highly persistent in the environment, meaning that they do not degrade.

88.     3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills would leach into groundwater and otherwise enter the environment. A 3M internal memo from 1960 described the company's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

89.     As early as 1963, 3M was aware that its PFAS products were persistent in the environment and would not degrade after disposal.

90.     3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

91.     3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

92.     By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

93.     One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

94.     In 1975, 3M found there was a "universal presence" of at least one form of PFAS in blood serum samples taken from across the United States.

95.     Because PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the near inevitability that its products were a pathway for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally but did not share outside the company.

96.     This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of this PFAS from 3M's products in human blood.

97.     According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M [No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)] ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

98.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

99.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

100.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

101.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

102.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

103.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

104.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

105.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

106.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

107.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

108.    A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and

ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

109.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

110.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

111.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

112.    According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

113.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a

direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

114.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

115.    In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

116.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

117.    On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

118.    In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

119.    3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in Ohio.

## OLD DUPONT'S KNOWLEDGE OF THE DANGERS OF PFAS

120.    Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States, including at its Washington Works plant in West Virginia ("Washington Works"), which discharged its PFOA and other PFAS wastes into the air, soils, groundwater, and surface waters, including the Ohio River.

121.    Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA (and later GenX) in large quantities into the environment, including into the air, groundwater, and surface waters, from its manufacturing plants, such that hundreds of thousands of people had been and would continue to be exposed to its PFOA and GenX, including through public and private drinking water supplies.

122.    Old DuPont company scientists issued internal warnings about the toxicity associated with their PFAS products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs.

123.    Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

124.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFAS exposure.

125.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

26

126.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

127.    Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

128.    The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

129.    Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

130.    Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

131.    While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure, and knew by at least 1982 that significant concentrations of PFOA would be present in the Ohio River as a result of its manufacturing operations in West Virginia.

132.    By at least 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources, including into Ohio.

133.    By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent.

134.    Old DuPont was long aware that the PFOA it was releasing from its facilities was leaching into groundwater and surface water used for public drinking water.

135.    After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

136.    Old DuPont employees who attended the 1984 Meeting discussed available technologies that could control and reduce PFOA releases from its manufacturing facilities, as well as potential replacement materials.

137.    Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

138.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

139.    They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."

140.    They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

141.    Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

142.    For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and

questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

143.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

144.    In 2005, Old DuPont settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

145.    The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

146.    Old DuPont also promised to phase out production and use of PFOA by 2015.

147.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

148.    After agreeing to phase out further manufacture and use of PFOA, Old DuPont (and then Chemours)  began replacing PFOA with GenX around 2009 and began shipping GenX to be used at Washington Works, where GenX then began to be used to make various products in which PFOA was previously used, and GenX being routinely emitted, released, and/or otherwise discharged into the environment from the various Old DuPont/Chemours facilities, including into the air and directly into surface and groundwater, which Old DuPont/Chemours knew would contaminate drinking water supplies for millions of people.

149.    Old DuPont and Chemours knew or should have known that, in their intended and/or common use, products containing PFAS, including but not limited to PFOA and GenX, would very likely injure and/or threaten public health and the environment in Ohio.

**OLD DUPONT'S MULTI-STEP, YEARS-LONG FRAUDULENT SCHEME
TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS**

## PFAS LIABILITIES AND HINDER CREDITORS

150.    Beginning in or about 2013 and continuing through at least June 2019, Old DuPont planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars in legacy environmental liabilities—especially those arising from PFOA and other PFAS contamination.

151.    Old DuPont's potential cumulative liability related to PFOA and other PFAS, including PFAS-containing AFFF, is likely billions of dollars due to the persistence, mobility, bioaccumulative properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

152.    As alleged, for more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several plants in West Virginia and other states. Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that scores of people had been exposed to PFOA, including through public and private drinking water supplies, like those in Ohio, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS, including PFAS-containing AFFF.

153.    Beginning, at least, in 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

154.    Old DuPont's in-house counsel were very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

155.    In 2005, after settling the Tennant case, Old DuPont settled the claims brought by EPA for violations of federal environmental laws related to its failure to disclose toxicity and exposure information for PFOA.

156.    Also in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled *Leach, et al. v. E. I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia.

157.    Under the terms of the final class action settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C8," a term used internally by DuPont employees, is an alternative name for PFOA. The settlement also provided that any class members

31

who developed the diseases linked by the C8 Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

158.    In 2012, after seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

159.    After the C8 Science Panel confirmed such probable links, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of the linked diseases under the terms of the 2005 settlement.

160.    These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio (the "C8 MDL"). Forty bellwether trials were scheduled to take place in 2015 and 2016.

161.    The first three trials in the C8 MDL ended in plaintiffs' verdicts. Each jury awarded damages in a larger amount than the one before it—the first awarded $1.6 million; the second awarded $5.6 million; and the third awarded $12.5 million. The second and third jury awards included punitive damages. Old DuPont then settled the remaining, pending claims for $670.7 million dollars.

162.    Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination caused by its manufacturing operations at other sites throughout the country, its releases and disposal of PFAS chemicals globally, and for toxic PFAS chemicals in its own products and the myriad of products

into which its toxic PFAS were incorporated, and that its liability likely measured in the billions of dollars.

163.    Anticipating this significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

164.    In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals" in or about 2013.

165.    However, neither Old Dow nor any other rational merger partner would agree to a transaction that would result in exposing it to the substantial PFAS liabilities that Old DuPont faced.

166.    Accordingly, Old DuPont's management decided to pursue a multi-year corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

167.    Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly traded company, (ii) the creation of New DuPont to facilitate a purported merger with Old Dow, and (iii) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly formed parent, Corteva.

168.    The first step in Old DuPont's plan was to transfer its Performance Chemicals business, which included Teflon and other products, the manufacture of which involved the use of PFOA, GenX, and other PFAS, into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate publicly traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

169.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

170.    Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct with regard to PFAS.

171.    The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

172.    In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures," which culminated in DowDuPont spinning off two new publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc. (i.e., New DuPont).

173.     Old DuPont's restructuring—beginning with the spinoff of Chemours in 2015, and ending with the spinoff of Corteva on June 1, 2019—was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

174.     As a result of these restructurings, between December 2014 (i.e., before the Chemours Spinoff) and December 2019 (i.e. after the Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

175.     New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

176.     Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva have, likely intentionally, acted to hide from creditors the details about where Old DuPont's valuable assets went and to hide the inadequate consideration that Old DuPont received in return.

177.     The below graphic depicts the restructuring as it progressed through each of the three steps:



178.    In greater detail, the restructuring scheme was implemented as follows.

**STEP 1: THE CHEMOURS SPINOFF**

179.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

180.    On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

181.    Prior to July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly traded entity.

182.    At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

183.    Prior to the spinoff, Chemours's Board of Directors was dominated by Old DuPont employees. As a result, during the period of time that the terms of its separation from Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

184.    To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

185.    Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

186.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

187.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

188.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Old DuPont required Chemours to fund these distributions through financing transactions, including senior

secured term loans and senior unsecured notes totaling approximately $3.995 billion, entered into on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

189.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of Plaintiff, and Old DuPont stripped Chemours's value for itself and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.

190.    In addition to the assumption of such liabilities, the Chemours Separation Agreement includes an indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

191.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA and GenX into the environment from Washington Works and elsewhere.

192.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross

negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

193.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

194.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

195.    There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

196.    The Chemours Spinoff was so one-sided that Chemours, in May 2019, sued Old DuPont, New DuPont and Corteva in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.*, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

197.    In its Amended Complaint—which was verified by Chemours's current Chief Executive Officer, Mark Newman—Chemours alleged that the primary motivation for the Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

198.    Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities was properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

199.    Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

200.    Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

201.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

202.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

203.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

204.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental

remediation. Chemours separately reported $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

205.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

206.    For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

207.    Had the full extent of Old DuPont's legacy liabilities been taken into account, as they should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time.

### STEP 2: THE OLD DOW/OLD DUPONT "MERGER"

208.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

41

209.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

210.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

211.    On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

212.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc. (*i.e.*, New DuPont), and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

213.    Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

214.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and

Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

215.     The corporate organization following the "merger" is depicted under "Step 2" in the graphic depicted above.

**STEP 3: THE SHUFFLING, REORGANIZATION, AND TRANSFER OF VALUABLE ASSETS AWAY FROM OLD DUPONT AND SEPARATION OF CORTEVA AND NEW DOW**

216.     Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

217.     It is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities.

218.     Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Materials Science Business."

219.     While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

220.     Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly formed business

lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

221.    The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned dispositions of the new companies):



222.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

223.    The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials

Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

224.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained. In particular, (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

225.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science or Specialty Products Businesses, including, its PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

226.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including Plaintiff's claims in this case.

227.    While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of the groundwater and surface water within Plaintiff's drinking water supply and Plaintiff's property.

228.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

229.    DowDuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

230.    On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont shareholders as a pro rata dividend.

231.    Corteva now holds 100% of the outstanding common stock of Old DuPont.

232.    The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in Step 3 of the graphic above.

233.    Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours Inc. (*i.e.*, New DuPont).

234.    On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

### THE EFFECT OF THE YEARS-LONG SCHEME TO DEFRAUD PLAINTIFF AND OTHER CREDITORS AND AVOID FINANCIAL RESPONSIBILITY FOR LEGACY LIABILITIES

235.    The net result of these transactions, including the June 1, 2019 Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

236.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

237.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

238.    For example, for the fiscal year ending in 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

239.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

240.    Also, for the fiscal year ending in 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ending in 2019, Old DuPont owned just under $21 billion in tangible assets.

241.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

242.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

243.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

244.    In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is far from clear that either entity will be able to satisfy future judgments.

245.    Indeed, New DuPont—to which PFAS liabilities are allocated under the DowDuPont Separation Agreement—has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value, and is in the process of divesting more.

246.    Old DuPont's parent holding company, Corteva—to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

247.    The Chemours Spinoff, the Dow-DuPont Merger, and the final separation of Corteva were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors.  The Chemours Spinoff constitutes a fraudulent transfer, which entitles Plaintiff to, among other things, void the transaction and recover property or value transferred from Chemours in the transaction. The Dow-DuPont Merger and separation of Corteva from New DuPont likewise constitutes a fraudulent transfer that entitles the State to, among other things, recover property and value transferred to New DuPont and Corteva.

**FIRST CAUSE OF ACTION**
**Strict Product Liability Based on Design Defect**
**(By Plaintiff against all Defendants)**

248.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully restated in this cause of action.

249.    Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling Fluorochemical Products.

250.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of Fluorochemical Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

251.    At the time of manufacture, Defendants knew that the chosen formulation(s) of Fluorochemical Products was not biodegradable, would bioaccumulate in humans and wildlife, and was toxic to humans and the environment.

252.    Defendants were also aware and/or in possession of an available safer design that was functional and reasonably priced.

253.    Defendants were also aware that their Fluorochemical Products, when sold would contaminate Plaintiff's property and drinking water supply and cause damages.

254.    Defendants' Fluorosurfactant Products were manufactured for placement into trade or commerce.

255.    On information and belief, the Fluorochemical Products as manufactured and/or sold by Defendants reached Plaintiff's property and drinking water supply without substantial change in its condition and was used by consumers, local manufacturers, local fire training academies, local fire departments, and airports, among others, in a reasonably foreseeable and intended manner.

256.    The Fluorochemical Products, as manufactured and/or sold by the Defendants, were "defective" and "unreasonably dangerous" when they left the Defendants' control, entered the stream of commerce, and were received by consumers, manufacturers, firefighting training

academies, local fire departments, and airports, among others because it was dangerous to an extent beyond that which would be contemplated by the ordinary user.

257.    The Fluorochemical Products Defendants manufactured and/or sold were defective in design because, even when used as intended and directed by Defendants, they can result in the contamination of soil and groundwater with PFAS creating a significant threat to drinking water supplies and damage to property.

258.    The Fluorochemical Products Defendants manufactured did not meet a consumer's reasonable expectation as to their safety because of the propensity to contaminate soil and groundwater when used as intended.

259.    Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time Defendants introduced Fluorochemical Products containing PFAS into the stream of commerce.

260.    The specific risk of harm in the form of soil, groundwater, and drinking water contamination from Fluorochemical Products containing PFAS that Defendants manufactured and/or sold was reasonably foreseeable or discoverable by Defendants.

261.    The design, formulation, manufacture and/or distribution and sale of Fluorochemical Products containing PFAS that were known to be toxic and extremely mobile and persistent in the environment was unreasonably dangerous.

262.    Fluorochemical Products' failure to perform safely was a proximate cause of Plaintiff's damage requiring investigation, treatment, filtration, monitoring, operation and maintenance costs and other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

## SECOND CAUSE OF ACTION
### Strict Products Liability Based on Failure to Warn
### (By Plaintiff against all Defendants)

263.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

264.     The use of Fluorochemical Products in the in the proximity of Plaintiff's property and drinking water supply for consumer use, manufacturing, training of fire personnel, firefighting, and disposal in landfills was a reasonably foreseeable use. Defendants knew or should have known that Fluorochemical Products used in this manner can contaminate soil, surface water, stormwater and groundwater with PFAS, creating a significant threat to human health and the environment.

265.     It was foreseeable that PFAS from the Fluorochemical Products that Defendants manufactured and sold would enter the environment, resulting in the contamination of soils and drinking water supplies that rely upon surface and/or ground water as a source, including Plaintiff's drinking water supply.

266.     Defendants knew or should have known of the risks posed by their Fluorochemical Products.

267.     The ordinary consumer—whether residential, industrial, municipal or otherwise—would not have known or appreciated the risk of contamination from ordinary use and disposal of Defendants' Fluorochemical Products without an appropriate warning.

268.     Defendants had a duty to warn Plaintiff, regulators, the public, and the users of Fluorochemical Products of these hazards.

269.     Defendants, however, failed to provide adequate warnings of these hazards.

270.     Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFAS affected the market's acceptance of these products containing PFAS.

271.    Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFAS prevented the users of the product from treating them differently with respect to their use and environmental cleanup.

272.    Defendants' failure to issue the proper warnings related to Fluorochemical Products containing PFAS prevented the users of the product from seeking alternative products, including but not limited to, using alternative products for purposes of training.

273.    Defendants' action in placing Fluorochemical Products containing PFAS into the stream of commerce without an appropriate warning as to use and disposal was a direct and proximate cause of Plaintiff's injury.

274.    Defendants knew or should have known, in the exercise of ordinary care, that their PFAS products were unreasonably dangerous and failed to warn of their dangerous propensity.

275.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff has suffered damage, requiring investigation, treatment, filtration, monitoring, operation and maintenance costs and suffered other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

### THIRD CAUSE OF ACTION
### Negligence
### (By Plaintiff against all Defendants)

276.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

277.    Defendants had a duty to Plaintiff to manufacture and/or market, distribute, and sell their Fluorochemical Products in a manner that avoided contamination of the environment and drinking water supplies and avoided harm to those who foreseeably would be injured by the PFAS contained in Defendants' Fluorochemical Products.

278.    The use, including the disposal of, Defendants' Fluorochemical Products by consumers, manufacturers, local fire training academies, fire departments, airports and others was a reasonably foreseeable use. Defendants knew or should have known that their Fluorochemical Products used and disposed of in this manner would contaminate soil, groundwater and surface water with PFAS, creating a significant threat to human health and the environment. Defendants had a duty to prevent the release into the environment of PFAS, in the foreseeable uses of their Fluorochemical Products.

279.    Defendants breached their duties when they negligently manufactured a dangerous product, negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used and/or disposed of in a manner such as to result in the contamination of soil, surface water and groundwater.

280.    Defendants, including but not limited to Old DuPont and Chemours, also negligently discharged their Fluorochemical Products, byproducts, precursors, and raw PFAS materials during their own manufacturing processes.

281.    As a direct and proximate result of Defendants' breaches of their duties, Defendants caused Plaintiff to suffer actual losses. Specifically, Plaintiff suffered damage requiring investigation, treatment, filtration, monitoring, operation and maintenance costs and suffered other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

### FOURTH CAUSE OF ACTION
### Continuing Trespass
### (By Plaintiff against all Defendants)

282.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

283.   Plaintiff owns property and possesses, and actively exercises in connection with its ownership and possessory interests, its rights to extract and use surface and groundwater for its drinking water supply.

284.   The Defendants were engaged in the business of researching, designing, formulating, handling, training, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for Fluorochemical Products and knew or should have known that the subsequent and foreseeable use and disposal of these products would contaminate soil and drinking water supplies. Thus, the Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity caused noxious and hazardous contaminants and pollutants to enter the surface water, stormwater, groundwater, drinking water supplies, and property of Plaintiff.

285.   Fluorochemical Products and PFAS compounds manufactured and/or supplied by the Defendants continue to be located on Plaintiff's property, in Plaintiff's drinking water supply sources, and Plaintiff's water treatment and distribution system.

286.   Plaintiff did not, and does not, consent to the trespass alleged herein. The Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

287.   The contamination of Plaintiff's property and drinking water supply sources has not yet ceased. Upon information and belief, PFAS continue to migrate into and enter surface and ground waters serving as Plaintiff's drinking water supply sources.

288.   As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff's property and the water serving as Plaintiff's drinking water supply sources has

been, and continues to be, contaminated with PFAS, causing Plaintiff significant injury and damage.

289.     As a direct and proximate result of these Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur investigation, treatment, filtration, monitoring, operation and maintenance costs and other damages related to the contamination of Plaintiff's property and drinking water supply in an amount to be proved at trial.

290.     As a further direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff seeks the value of the use of its property for the time of the wrongful occupation, the reasonable costs of repair or restoration of all of Plaintiff's property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Defendants related to the trespass. The Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of Plaintiff's property and drinking water supply sources with PFAS. The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including Plaintiff's property and drinking water supply sources. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

**FIFTH CAUSE OF ACTION**
**Public and Private Nuisance**
**(By Plaintiff against All Defendants)**

291.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

292.    Plaintiff is the owner of land, easements, and/or water rights, including but not limited to those which permit it to use surface water and extract groundwater for use in its drinking water system.

293.    The actions of the Defendants as alleged herein, have resulted in the continuing contamination of Plaintiff's property and drinking water supply sources, and such contamination is a public nuisance and is reasonably abatable and varies over time. Each Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

294.    The actions of the Defendants constitute a nuisance in that the contamination of property, surface water, groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiff's free use of their property, so as to interfere with the comfortable enjoyment of life or property. The contamination of Plaintiff's property and drinking water supply sources significantly affects, at the same time, a considerable number of people in an entire community.

295.    Each Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

296.    By its design, the Defendants' Fluorochemical Products were known by Defendants to contain compounds that would likely be discharged to the environment in a manner that would create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner as to avoid creating or contributing to a nuisance.

297. The Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFAS would have on the environment and human health.

298. The Defendants caused or contributed to the creation of the nuisance at issue by releasing wastes containing PFAS from their manufacturing and/or disposal facilities and/or directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFAS in a manner that the Defendants knew or should have known would result in the contamination of soil, surface water, and groundwater and ultimately impact drinking water supplies.

299. Plaintiff did not and does not consent to the public nuisance alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to this public nuisance.

300. As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff's property and drinking water supply sources are contaminated with PFAS, causing Plaintiff significant injury and damage.

301. As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, filtration, monitoring, operation and maintenance costs and other damages in an amount to be proved at trial.

302. Furthermore, as a direct and proximate result of the Defendants' acts and omissions as alleged herein, the contamination of Plaintiff's property and drinking water supply sources constitutes an ongoing public nuisance.

303. The Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the

PFAS that contaminate Plaintiff's property and drinking water supply sources does not present a risk to the public.

304.    Plaintiff has been damaged because the Defendants' acts and omissions, have unreasonably interfered with, and continue to interfere with, Plaintiff's use and enjoyment of its property and public water supply system and has suffered and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, treatment, filtration, monitoring, operation and maintenance costs and other costs and damages related to the detection and remediation of the PFAS contamination on its property and in its drinking water supply.

305.    The Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including contamination of property and drinking water supplies with PFAS.

306.    The Defendants knew with substantial certainty at the time of their manufacture and sale of fluorosurfactants, fluorochemicals, and products containing PFAS that their products and/or manufacturing releases would result in contamination of Plaintiff's property and drinking water supply sources.

307.    The Defendants' acts and omissions were substantially certain to and did result in an unreasonable interference with Plaintiff's property and drinking water supply sources.

308.    As a direct and proximate result of the Defendants' acts and omissions, the Defendants caused Plaintiff to suffer actual losses.

309.    The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of Fluorochemical Products, fluorosurfactants, and fluorochemicals to maximize

profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment.

310.    Specifically, Plaintiff suffered damages including, but not limited to, incurring costs related to the investigation, treatment, filtration, monitoring, operation and maintenance costs and other costs and suffered other damages in an amount to be determined at trial.

311.    Additionally, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

## SIXTH CAUSE OF ACTION
### Declaratory Relief
### (By Plaintiff against All Defendants)

312.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

313.    Defendants knew, or should have known, that their Fluorochemical Products, when used in a foreseeable and intended manner, and wastes released from their Fluorochemical Products manufacturing processes were dangerous and created an unreasonable and excessive risk of harm to human health and the environment.

314.    Defendants intentionally, willfully, deliberately and/or negligently failed to properly warn, train, handle, control, dispose, and release noxious and hazardous contaminants and pollutants, such that Defendants created substantial and unreasonable threats to human health and the environment, which resulted from the foreseeable and intended manufacture, use, and storage of Fluorochemical Products and products containing fluorosurfactants and fluorochemicals.

315.     Among other things, Plaintiff must take costly remedial action to remove PFAS contamination from its property and drinking water supply which will result in substantial costs, expenses, and damages in an amount to be proved at trial.

316.     These Defendants, and each of them, have failed to reimburse Plaintiff for the cost of investigation, filtration and/or deny any responsibility or liability for these damages and expenses Plaintiff will incur in the future.

317.     An actual controversy exists concerning who is financially responsible for abating actual or threatened pollution or contamination of Plaintiff's property and drinking water supply by PFAS.

318.     In order to resolve this controversy, Plaintiff seeks an adjudication of the respective rights and obligations of the parties, and other relief to the extent necessary to provide full relief.

## SEVENTH CAUSE OF ACTION
### Actual Fraudulent Transfer In Relation to Chemours Spinoff
### (By Plaintiff against Old DuPont, Chemours, Corteva, and New DuPont)

319.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

320.     Plaintiff seeks equitable and other relief against Old DuPont and Chemours under Ohio Rev. Code 1336.01 to 1336.11 and Delaware Code title 6, §§ 1301 to 1312.

321.     Under Ohio Rev. Code 1336.04(a)(1) and Delaware Code title 6, § 1304(a)(1), a transaction made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor" is voidable as to the creditor's claim.

322.     Under Ohio Rev. Code 1336.01(C), (D) and Delaware Code title 6, §§ 1301(3), (4), a "creditor" is "a person who has a claim," "whether or not the right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

323.    Plaintiff is and was a creditor of Chemours at all relevant times.

324.    Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

325.    The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

326.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

327.    Chemours made the Chemours Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours.

328.    Plaintiff has been harmed as a result of the Chemours Transfers.

329.    Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Del. Code tit. 6, §§ 1301 to 1312, Plaintiff seeks to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

330.    Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Del. Code tit. 6, §§ 1301 to 1312, Plaintiff also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of Plaintiff.

331.     Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

### EIGHTH CAUSE OF ACTION
**Constructive Fraudulent Transfer in Relation to the Chemours Spinoff**
**(By Plaintiff against Old DuPont, Chemours, Corteva, and New DuPont)**

332.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

333.     Plaintiff seeks equitable and other relief against Old DuPont and Chemours under Ohio Rev. Code 1336.01 to 1336.11 and Delaware Code title 6, §§ 1301 to 1312.

334.     Under Ohio Rev. Code 1336.04(A)(2), 1336.05(A) and Delaware Code title 6, §§ 1304(a)(2), 1305(a), a transaction made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation" is voidable if the debtor: (i) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; (ii) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due"; or (iii) "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

335.     Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

336.     Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

337.     At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

338. Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

339. Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

340. At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

341. Plaintiff has been harmed as a result of the Chemours Transfers.

342. Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Del. Code. Tit. 6, §§ 1301 to 1312, Plaintiff seeks to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

343. Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Del. Code. Tit. 6 §§ 1301 to 1312, Plaintiff also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of Plaintiff.

344. Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

### NINTH CAUSE OF ACTION
**Actual Fraudulent Transfer In Relation to the Dow-DuPont Merger and Subsequent Reorganizations, Divestitures, and Separation of Corteva**
**(By Plaintiff against Old DuPont, New DuPont, and Corteva)**

345. Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

346.     Plaintiff seeks equitable and other relief against Old DuPont, New DuPont, and Corteva under Ohio Rev. Code 1336.01 to 1336.11 and Delaware Code title 6, §§ 1301 to 1312.

347.     Plaintiff is and was a creditor of Old DuPont at all relevant times.

348.     Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities. Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

349.     The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

350.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

351.     Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

352.     Plaintiff has been harmed as a result of the Old DuPont Transfers.

353.     Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiff that have been damaged as a result of the actions described in this Complaint.

354.     Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Del. Code. Tit. 6, §§ 1301 to 1312, Plaintiff seeks to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

355.     Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Del. Code. Tit. 6, §§ 1301 to 1312,, Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing,

transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of Plaintiff.

**TENTH CAUSE OF ACTION**
**Constructive Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations**
**(By Plaintiff against Old DuPont, New DuPont, and Corteva)**

356.     Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

357.     Plaintiff seeks equitable and other relief against Old DuPont, New DuPont, and Corteva under Ohio Rev. Code 1336.01 to 1336.11 and Delaware Code title 6, §§ 1301 to 1312.

358.     Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

359.     Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

360.     At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

361.     Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

362.     Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

363.     At the time that the Old DuPont Transfers were made, Old DuPont, New DuPont, and Corteva intended to incur, or believed, or reasonably should have believed that Old DuPont would incur debts beyond its ability to pay as they became due.

364.    Plaintiff has been harmed as a result of the Old DuPont Transfers.

365.    Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Delaware Code title 6, §§ 1301 to 1312, Plaintiff seeks to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

366.    Pursuant to Ohio Rev. Code 1336.01 to 1336.11 and Delaware Code title 6, §§ 1301 to 1312, Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A.    Entry of judgment in Plaintiff's favor and against Defendants, jointly and severally, as applicable, on each Count of this Complaint;

B.    An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, treatment, filtration, monitoring, and operation and maintenance costs incurred or to be incurred by Plaintiff to remove PFAS from its property and drinking water supply system;

C.    An order that Defendants are required to abate the nuisance Defendants have caused;

D.    An order voiding the Chemours Transfers and the DuPont Transfers to the extent necessary to satisfy Plaintiff's claims;

E.      An order enjoining Old DuPont from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Chemours;

F.      An order enjoining New DuPont and Corteva from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

G.      An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

H.      An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

I.      An award for punitive damages; and

J.      An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Respectfully submitted,

By Its Attorneys,

Dated: August 31, 2023

  *s/s Robert A. Bilott*
Robert A. Bilott
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Telephone: (513) 381-2838
Fascimile: (513) 381-0205
bilott@taftlaw.com

David J. Butler
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, Ohio 43215
Telephone: (614) 221-2838
Fascimile: (614) 221-2007
dbutler@taftlaw.com

Kenneth A. Sansone
SL ENVIRONMENTAL LAW GROUP PC
175 Chestnut Street
San Francisco, CA 94133
Telephone: (603) 227-6298
Facsimile: (415) 384-8333
ksansone@slenvironment.com

Kevin J. Madonna
LAW OFFICE OF KEVIN MADONNA, PLLC
48 Dewitt Mills Road
Hurley, NY 12443
Telephone: (845) 481-2622
Facsimile (845) 230-3111
kmadonna@kennedymadonna.com

Michael A. London
Gary J. Douglas
Rebecca G. Newman
Tate J. Kunkle
DOUGLAS & LONDON, P.C.
59 Maiden Ln, 6th Fl,
New York, NY 10038
Telephone: (212) 566-7500
gdouglas@douglasandlondon.com
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com
tkunkle@douglasandlondon.com

Ned McWilliams
LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN &
MOUGEY, P.A.
316 S. Baylen St.
Pensacola, Florida 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com

68

Andrew W. Homer
KELLEY DRYE & WARREN LLP
888 Prospect St., Suite 200
La Jolla, CA 92037
Telephone: (858) -795-0426
Facsimile: (713) 355-5001
ahomer@kelleydrye.com

David I. Zalman
Levi M. Downing
Julia R. Schuurman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7985
Email: dzalman@kelleydrye.com
Email: ldowning@kelleydrye.com
Email: jschuurman@kelleydrye.com

Elizabeth N. Krasnow
KELLEY DRYE & WARREN LLP
201 Broad Street
Stamford, CT 06901
Telephone: (203) 324-1400
Email: ekrasnow@kelleydrye.com